**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **NAVISTAR, INC.**, a Delaware corporation, ) | FILED: JULY 22, 2008 |
| ) | 08CV4162 |
| Plaintiff, ) | JUDGE MORAN |
| v. ) | MAGISTRATE JUDGE ASHMAN |
| ) | Case No.: _____ |
| ) | PH |
| **JOHN MEIER MOTOR COMPANY**, a ) | |
| Missouri corporation, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT

Plaintiff Navistar, Inc. ("Navistar"), for its complaint against Defendant John

Meier Motor Company ("JMMC"), states as follows:

1.     This is an action for money damages for breach of contract based on

JMMC's violations of the Dealer Sales/Maintenance Agreement (the "Dealer

Agreement") entered into between the parties on or about October 26, 1987.  A copy of

the Dealer Agreement is attached as Exhibit A.

### The Parties

2.     Navistar is a Delaware corporation with its principal place of business in

Warrenville, Illinois.  Navistar was formerly known as International Truck and Engine

Corporation and Navistar International Transportation Corporation.  Navistar

manufactures and assembles trucks and distributes truck parts and accessories.  Navistar

operates through a network of independent dealers located throughout the United States,

Canada and Mexico.

3.     JMMC is a Missouri corporation with its principal place of business in

Crystal City, Missouri.  JMMC operates a motor vehicle dealership in Crystal City,

Missouri that offers for sale trucks, parts accessories and related services.  JMMC is a Navistar dealer.

## Jurisdiction and Venue

4.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.00, excluding interest and costs.

5.     Venue is proper in this District under 28 U.S.C. 1391(a), because JMMC conducted business here with a citizen of this District and has breached and threatens to breach duties to Navistar based on a contract substantially connected to this District.

## Facts

6.     Pursuant to the Dealer Agreement, JMMC is a Navistar dealer.  Pursuant to the Dealer Agreement, JMMC's "primary area of responsibility" is in "the non-exclusive geographical area" assigned by Navistar and known as JMMC's "Trade Area." Since JMMC became a Navistar dealer, its non-exclusive Trade Area has consisted of a geographical area in and around Crystal City, Missouri.

7.     JMMC agreed, pursuant to Section 16(a)(1)(i) of the Dealer Agreement, to maintain "a building or buildings and outside area of acceptable appearance and sufficient size for properly displaying, handling and warehousing vehicles and other goods delivered to it under this Agreement and for other operating requirement."

8.     JMMC agreed, pursuant to Section 16(a)(1)(ii) of the Dealer Agreement, to maintain "a maintenance center adequate in size to meet the service requirements of the user-customer located in the dealer's trade area including service tools, and equipment, and library as recommended by [Navistar]."

9.      JMMC agreed, pursuant to Section 16(a)(1)(iii) of the Dealer Agreement, to maintain "maintenance parts stocking facilities and equipment necessary for the attractive display and efficient storage and handling of parts, attachments and accessories."

10.     JMMC agreed, pursuant to Section 16(a)(1)(iv) of the Dealer Agreement, to maintain "office furniture and equipment that will enable it to maintain complete and accurate records of its business in keeping with sound business practice."

11.     JMMC agreed, pursuant to Section 16(a)(1)(v) of the Dealer Agreement, to maintain "product and maintenance signs recommended and approved by Navistar, in good condition at conspicuous and appropriate locations inside and outside of the retail establishment."

12.     JMMC agreed, pursuant to Section 16(a)(2) of the Dealer Agreement, "[t]o provide at all times sufficient working capital and net worth to enable it to fulfill properly all of the Dealer's responsibilities and duties under the Agreement."

13.     JMMC agreed, pursuant to Section 16(b)(1) of the Dealer Agreement, "[t]o achieve a reasonable share of the market, for the goods and services covered by the Agreement, in the Trade Area served by the Dealer's location."

14.     JMMC agreed, pursuant to Section 16(b)(2) of the Dealer Agreement, "[t]o promote aggressively the sale of each item of goods covered by the Agreement of the type of which a demand exists within the trade area served by the dealer and participate in promotional programs that may be announced by Navistar from time to time."

15.     JMMC agreed, pursuant to Section 16(b)(4) of the Dealer Agreement, "[t]o maintain an inventory of  Navistar vehicles, optional equipment, maintenance parts, and accessories at or above the minimum levels established by Dealer Central and in keeping with the sales possibilities in its Trade Area for all good covered by the Agreement."

16.     JMMC agreed, pursuant to Section 16(b)(5) of the Dealer Agreement, "[t]o cooperate with Navistar by placing orders for goods in accordance with advance ordering programs announced by Navistar."

17.     JMMC agreed, pursuant to Section 16(c)(1) of the Dealer Agreement, "[t]o engage, train and maintain sales personnel sufficient to obtain a reasonable share of the sales possibilities in its Trade Area for the goods covered by the Agreement."

18.     JMMC agreed, pursuant to Section 16(c)(8) of the Dealer Agreement, "[t]o attend Navistar-conducted or sponsored product, sales and maintenance meetings and use training materials and programs which may be offered by Navistar from time to time."

19.     JMMC agreed, pursuant to Section 25 of the Dealer Agreement, "[t]o maintain accounting records that at all times accurately reflect the financial condition of its business and enable it to prepare monthly operating statements.  The Dealer agrees to furnish financial (balance sheet) and operating (profit and loss) statements to Navistar, and any designated affiliate of Navistar, in the format prescribed by Navistar via the DCN, quarterly or otherwise as requested by Navistar.  In addition, the Dealer will send their fully detailed and audited financial and operating statements to Central Dealer

-4-

Administration and any designated affiliate of Navistar within sixty (60) days after the close of its fiscal year."

20.     JMMC has repeatedly breached each of the foregoing sections of the Dealer Agreement by failing and refusing to (1) maintain a dealership of acceptable appearance and size because the dealership does not have sufficient space for the sale of Navistar products and the dealership portrays an image that reflects poorly on Navistar; (2) use office furniture and equipment that will enable it to maintain complete and accurate business records by failing to register users for Navistar's Dealer E-mail system; (3) provide at all time sufficient working capital and net worth to enable it to properly fulfill all of the Dealer's responsibilities and duties under the Agreement because effective August 12, 1999 Navistar placed JMMC on a cash-with-order basis and finance hold due to non-payment of the open account; (4) achieve a reasonable market share of Navistar products in the Trade Area by failing to sell numbers of heavy duty and medium duty trucks commensurate with the market; (5) promote aggressively Navistar products — including trucks and parts — in the Trade Area, because performance in new truck deliveries is unacceptably low; (6) maintain the required inventory of Navistar products by failing to stock a sufficient number of heavy duty trucks commensurate with sales possibilities in the Trade Area; (7) cooperate with Navistar by placing orders for goods in accordance with advance ordering programs announced by Navistar because JMMC does not have adequate inventory on hand and does not have stock orders in the system to make up the deficiencies; (8) engage, train and maintain sales personnel sufficient to obtain a reasonable share of the sales possibilities in its Trade Area for the goods covered by the Agreement because the level of training of JMMC's service department is

-5-

incomplete; (9) attend Navistar-conducted meetings by failing to attend the 2002, 2003, 2004, 2005 and 2006 Dealer Meetings; and (10) furnish financial and operating statements to Navistar in the format prescribed by Navistar via the DCN because Dealer Central Administration and Navistar Financial Corporation have not received audited financial statements from JMCC for fiscal year 2004, 2005 and 2006, and JMCC has not furnished financial statements via the DCN as required by the Dealer Agreement. Navistar notified JMMC of these breaches through letters dated October 22, 2007 and May 19, 2008.  Copies of these letters are attached as Exhibit B.

21.    As a result of JMMC's breaches of contract, Navistar has been injured. Navistar lost profit on sales of trucks and truck parts in an amount not presently known, but in excess of $75,000.

## COUNT I – BREACH OF CONTRACT

22.    Navistar incorporates and realleges herein paragraphs 1-21.

23.    The Dealer Agreement is a valid and enforceable contract between Navistar and JMMC.

24.    Navistar has fully and completely performed all of its obligations under the Dealer Agreement.

25.    JMMC has repeatedly breached Sections 16(a)(1)(i), (ii), (iii), (iv) and (v), 16(a)(2), 16(b)(2), 16(b)(4), 16(b)(5), 16(c)(1), 16(c)(8) and 25 of the Dealer Agreement. Each breach of the Dealer Agreement by JMMC is a separate and distinct violation of the Dealer Agreement.

26.    JMMC's breaches of the Dealer Agreement have injured Navistar and caused it damages.

CH1 11515067.2

WHEREFORE, Navistar requests that this Court:

A.      Award Navistar the damages it has suffered in an amount to be proven, but exceeding $75,000;

B.      Award Navistar its costs of this action, including its attorneys' fees; and

C.      Award Navistar such other and further relief as is appropriate.


                                        NAVISTAR, INC


                                By:     s/ Louis S. Chronowski
                                        One of its Attorneys


Michael R. Levinson
Louis S. Chronowski
Dana M. Orr
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000

Dated: July 22, 2008

CH1 11515067.2

# EXHIBIT A



# Dealer Sales/Maintenance Agreement

TRUCKS - PARTS - MAINTENANCE

# CONTENTS

| Section | General Purposes of the Agreement | Page |
|---|---|---|
| 1. | Dealer Established | 3 |

**Purchase, Sale, and Servicing of Goods**

| | | |
|---|---|---|
| 2. | Goods Covered by this Agreement | 3 |
| 3. | Orders for Goods | 4 |
| 4. | Prices, Discounts, Terms, and Freight Delivery | 4 |
| 5. | Price Changes | 5 |
| 6. | Model Change-over | 5 |
| 7. | Model Carry-over | 6 |
| 8. | Claims Against Navistar for Shortage or Damage | 6 |
| 9. | Customer Order Forms, Warranty, and Warranty Adjustments | 6 |
| 10. | Field Changes | 8 |
| 11. | Sales by Navistar | 8 |
| 12. | Changes in Design | 8 |
| 13. | Sales on Credit | 9 |
| 14. | Collateral Security | 10 |
| 15. | Finance Plan | 10 |

**Operating Requirements**

| | | |
|---|---|---|
| 16. | Dealer Facilities and Activities | 10 |
| 17. | Use of Trade Names, Trademarks and Signs | 12 |
| 18. | Estimates, Inventory, and Delivery Reports | 13 |
| 19. | Service Parts | 13 |
| 20. | Contingencies Affecting Delivery to the Dealer | 13 |
| 21. | Delivery, Risks of Shipment, and Routing of Shipment | 14 |
| 22. | Storage | 14 |
| 23. | Insurance | 14 |
| 24. | Advertising and Sales Promotion | 15 |
| 25. | Accounting Records and Financial Reports | 15 |
| 26. | Dealer Performance Review | 15 |

**Termination of Agreement**

| | | |
|---|---|---|
| 27. | Termination by Mutual Consent or by Advance Notice | 15 |
| 28. | Termination by Immediate Notice | 16 |
| 29. | Deliveries After Termination | 18 |
| 30. | Succession of Dealer | 18 |
| 31. | Deferral of Termination in the Event of Death or Incapacity | 19 |
| 32. | Repurchase of Dealer's Stock and Signs Upon Termination of the Agreement | 19 |

**General Provisions**

| | | |
|---|---|---|
| 33. | Dealer Not Navistar's Agent | 21 |
| 34. | Parties Bound, Effect of Partial Invalidity and Assignment | 21 |
| 35. | Agreement Complete | 21 |
| 36. | Approval of Agreement | 21 |

2

THIS AGREEMENT, entered into this _____ *26* day of *October* ,

19 *87* , to be effective the _____ *26* day of *October* ,

19 *87* , (hereinafter referred to as "Agreement") between NAVISTAR INTERNATIONAL TRANSPOR-

TATION CORP. with its Central Dealer Administration located at *4551 W 107th St,*

*Overland Park, Ks. 66107*

(hereinafter referred to as "Navistar"), and _____

*John Meier Motor Company*

(State whether an individual, partnership or corporation. If a corporation, show name of state in which incorporated.)

*A Missouri Corporation*

If a partnership, state names of partners.)

with a retail establishment for the sale of the goods covered by this Agreement at _____

*213 Truman Blvd.*          *Crystal City,*
         (Street Address)                    (Town)

*Jefferson*                   *Mo. 63019*
       (County)                        (State)

(hereinafter referred to as the "Dealer").

When used in the Agreement, the following terms shall have the following meanings:

(i)   Central Dealer Administration (hereinafter referred to as "CDA") refers to Navistar's office responsible for the implementation and administration of the Agreement.

(ii)   Dealer Central refers to Navistar's office responsible for sales to Dealers of goods of the type covered by the Agreement in the Trade Area where the Dealer's retail establishment is located.

(iii)   Dealer Central Management refers to the Regional Dealer Sales Manager or National Sales Manager or to persons holding, as may be announced by Navistar from time to time, positions of similar responsibility, whether or not such persons operate out of Dealer Central.

(iv)   Trade Area refers to the non-exclusive geographical area which may be assigned to the Dealer by Navistar, and changed by Navistar from time to time, considered as the Dealer's primary area of responsibility for the sales of goods covered by the Agreement.

### General Purposes of the Agreement

*Dealer Established*

1. The general purposes of the Agreement are to establish Dealer as a dealer of the goods covered by the Agreement, and to govern the relations between the Dealer and Navistar in promoting the sale of those goods, in their purchase and sale by the Dealer, and in providing warranty and other services for their users.

### Purchase, Sale and Servicing of Goods

*Goods Covered by the Agreement*

2. The provisions of the Agreement shall apply to the models and series of new International vehicles, and optional equipment therefor, covered by the Schedule(s) of Discounts and Terms to Dealers referenced and checked below and issued by Navistar and in effect on the effective date of the Agreement. The Agreement also covers all accessories and maintenance parts for the vehicles covered by the Agreement which Navistar from time to time offers for sale generally to its vehicle dealers.

3

✓ Schedule of Discounts and Terms J-82

☐ Schedule of Discounts and Terms J-84

☐ Other: _____

Additions to or eliminations from the models and series of International vehicles covered hereby may be made by Navistar, without incurring any responsibility to the Dealer, by indicating such changes from time to time through revisions of the Schedules of Discounts and Terms to Dealers. Such revisions effecting changes in models and series of vehicles covered hereby will be made only when the changes in its models or series of vehicles are made by Navistar.

The Agreement, however, shall apply only to such goods delivered to the Dealer by Navistar for the account of the retail establishment referred to in the heading of the Agreement.

*Orders for Goods*

3. The goods covered by the Agreement which the Dealer desires to purchase shall be covered by orders submitted from time to time by the Dealer to Navistar as designated by Navistar.

Subject to the provisions of this Agreement relating to the cancellation of the Dealer's orders and to Section 20 relating to contingencies affecting delivery to the Dealer, Navistar's obligation to sell goods to the Dealer and the Dealer's obligation to purchase goods from Navistar shall be limited to the goods described in Dealer Communication Network ("DCN") orders submitted by the Dealer that are accepted by Navistar.

An order from the Dealer shall not be considered as accepted until an acceptance notice is received by the Dealer from Navistar over the DCN or delivery has been made to the Dealer of goods described therein.

Except as provided in Section 5, relating to cancellation of orders if prices are increased, an order from the Dealer accepted by Navistar will not be subject to cancellation by the Dealer without approval of Dealer Central via the DCN.

The Dealer will place orders for goods in accordance with procedures established from time to time by Navistar so that Navistar will have time for the orderly manufacture and distribution of such goods.

The Dealer agrees that Navistar may insert in any order received from it, the prices and terms applicable to the goods described in such order and their particular descriptions, including numbers and distinguishing marks of such goods, and that it shall be bound thereby as if such details, prices, etc., had been contained in the order at the time it transmitted the order over the DCN. In addition, the Dealer agrees that Navistar may insert in any such order equipment or attachments made mandatory by applicable law in connection with the manufacture and/or sale of the products ordered as if such details, prices, etc. had been contained in the order at the time it transmitted the order over the DCN.

*Prices, Discounts Terms and Freight Delivery*

4. Prices, discounts and terms applying to the goods ordered by the Dealer shall be those established by Navistar and in effect on the date of shipment of goods to the Dealer. Such prices, discounts and terms shall be subject to the conditions stated in the applicable Schedules of Discounts and Terms.

F.O.B points applicable to the various classes of goods delivered to the Dealer shall be those established by Navistar and in effect at the time of delivery. When a shipment is made from a point other than a plant, Navistar reserves the right to add an amount to cover handling and transportation charges from plant to point of shipment.

4

When Navistar delivers goods ordered by the Dealer, the Dealer will accept delivery at points of delivery selected by Navistar and pay all transportation charges thereon from the F.O.B. point or points named by Navistar to destination. Navistar, however, reserves the right to prepay delivery and transportation charges from the F.O.B. point to destination and make such charges therefor to the Dealer as Navistar may establish.

The Dealer agrees to reimburse Navistar for all expenses incurred by Navistar for boxing, crating, packing, multiple-decking, loading and handling goods covered by the Agreement; the Dealer also shall be responsible for providing, at its expense, adequate undecking facilities for the use of driveaway companies. The Dealer agrees also to pay such amount as Navistar shall, in its discretion, add to its dealer prices as a specific charge for advertising.

Prices, discounts, terms, F.O.B. points and all other charges are subject to change at any time upon issuance of notice by Navistar to the Dealer of such change.

Any taxes imposed by any laws of the United States, any State, territory or municipality, or other authority, which Navistar may be required to pay or to reimburse to others by reason of the manufacture, ownership, use or sale of any goods delivered under the Agreement, will be added to the price of the goods either as a separate item or included in the invoice price of the goods, as the law may require or Navistar may determine.

**Price Changes**

5. If the price of any vehicle chassis or chassis and body combination ordered by the Dealer is increased after receipt of the order by Navistar and prior to the delivery of such vehicle, the Dealer may, by communication via the DCN to Navistar at any time within ten (10) days after notice of such price increase has been given, cancel the order insofar as it covers vehicles to which such price increase is applicable.

If Navistar voluntarily reduces its price to dealers on a vehicle chassis or chassis and body combination, it will refund or credit to the Dealer's account, on all chassis or chassis and body combinations delivered to the Dealer under the Agreement prior to such price reduction which are of the same code as that for which the price reduction is announced and which are on hand, unused and unsold in the Dealer's stock at the time such price reduction is made, an amount equal to the excess, if any, of the price charged to the Dealer, or the price resulting from a prior price reduction under this section, for any such chassis or chassis and body combination, with optional equipment and tires included therewith, over Navistar's price to dealers for the same chassis or chassis and body combination with the same optional equipment and tires in effect at the time of such chassis or chassis and body combination price reduction. Refunds or credits for price reductions will be issued by Navistar upon receipt of an application from the Dealer via the DCN, accompanied by satisfactory evidence that it is entitled to the price reduction, within thirty (30) days after the effective date of the reduction.

Navistar reserves the right to pay the credits resulting from price reductions to the holders of lien instruments on the vehicles on which price reductions are made.

No adjustment will be made under this section on account of any reduction in the amount of Navistar's charge for delivery, transportation, destination charges, freight, handling, or on account of any reduction in the amount of taxes.

**Model Change-over**

6. Vehicles covered by this Agreement will be subject to periodic model changes.

At the time of a model change, Navistar will offer a discontinued model allowance no less than 4% of the plant list price involved for the chassis and optional equipment (not to include plant surcharge, warehouse charges, special A&H or goods purchased items).

The discontinued model allowance will apply to each new, unused and unsold discontinued model vehicle which is in dealer inventory on the effective date as announced by Navistar. The effective date will be no later than the date the new models are announced by Navistar to the general public.

A discontinued model vehicle used for demonstration purposes shall be eligible for the same allowance as a new and unused discontinued model vehicle, provided it was new and unused at the time it was placed in demonstrator service and has not qualified or will not qualify for a special allowance under any Navistar demonstration plan. Discontinued model vehicles in sales and service operation will not qualify for the discontinued model allowances.

Dealers must make application to Dealer Central for discontinued model allowances within thirty (30) days from the effective date of the allowance as announced by Navistar.

No vehicle on which a discontinued model allowance shall have been made, will be eligible for a "carry-over allowance" described in Section 7.

|  |  |
|---|---|
| *Model Carry-over* | 7. Vehicles will, when eligible, be subject to a carry-over model allowance. |

A carry-over allowance no less than 4% of the plant list price invoiced for the chassis and optional equipment, will be made on any new medium or heavy-duty vehicle unused and unsold in Dealer or Navistar inventory when twelve (12) months have elapsed from the date of original plant invoice. The carry-over allowance will not be calculated on the plant surcharge, warehouse charges, special A&H or goods purchased items.

A carry-over allowance will be paid only once on a vehicle. No vehicle on which a carry-over allowance has been made will be eligible for a discontinued model allowance as previously described in Section 6.

A vehicle used for demonstration purposes shall be eligible for the same carry-over allowance as a new and unused vehicle, provided it was new and unused at the time it was placed in demonstrator service and has not qualified or will not qualify for a special allowance under any Navistar demonstration program. A vehicle placed in sales and service operation will not qualify for the carry-over allowance.

Dealers must make application for carry-over allowance to Dealer Central within thirty (30) days of the date a vehicle becomes eligible.

|  |  |
|---|---|
| *Claims Against Navistar for Shortage or Damage* | 8. The Dealer agrees that it will promptly examine all goods when they are received and that it will notify Navistar via the DCN within ten (10) days of the receipt of such goods of all shortages or damages claimed to have existed at the time of shipment. Within a reasonable time, Navistar will investigate the claim and inform the Dealer of its findings and deliver to the Dealer parts short or damaged at the time of shipment. Navistar will not be responsible for shortages or damages at the time of shipment unless claim is made by the Dealer within ten (10) days of the receipt of the goods. |

Claims for shortages and damages occurring in transit from the point of shipment shall be made by the Dealer against the carrier of the goods as provided in Section 21 of the Agreement.

|  |  |
|---|---|
| *Warranty and Warranty Adjustments; Indemnification* | 9. Navistar warrants to the Dealer that all goods (except tires, tubes and diesel engines not manufactured by Navistar) sold under the Agreement will be free from defects in material and workmanship. The obligation of Navistar under this warranty is limited to providing for the repair or replacement, in accordance with the warranty adjustment policies of Navistar, of any part or parts found defective and of which Navistar is promptly advised by the Dealer. This warranty shall apply while the item of goods is new and unused in the Dealer's inventory and shall be in lieu of all other warranties, express or implied. Navistar makes no warranty of MERCHANTABILITY or FITNESS FOR PARTICULAR PURPOSE. |

The extent of Navistar's obligations in connection with the resale of any of the new vehicles covered by the Agreement will be expressed in Navistar's written user warranty (referred to in this Agreement as a "Warranty") contained in printed order forms or separate warranty certificates furnished by Navistar to the Dealer for its use in reselling the new vehicles covered by the Agreement to user-customers. This warranty will be in lieu of all other warranties, express or implied, and the Dealer is not authorized to assume for Navistar any additional obligations or liabilities in connection with the sale of the new vehicles covered by the Agreement.

The Dealer agrees to extend Navistar's Warranty to its user-customers by using the method established by Navistar or by using an order form which incorporates by reference Navistar's standard new vehicle Warranty and which provides that the user-customer has acknowledged receipt of a copy of such Warranty. The Dealer further agrees to deliver to each of its user-customers, at the time of delivery of the vehicle, a Warranty certificate furnished by Navistar. In the event the Dealer subjects itself to liability to a user-customer more extensive than the obligations imposed upon Navistar by Navistar's Warranty in use at the time of sale to the user-customer, then the Dealer alone shall be responsible to the user-customer and the Dealer shall have no recourse against Navistar with respect thereto; and the Dealer agrees to indemnify and save Navistar harmless from any claim by a user-customer based upon an express or implied warranty by the Dealer to the user-customer which is more extensive than the Warranty of Navistar.

The Dealer agrees to furnish without charge warranty service to users entitled thereto for goods of the types covered by the Agreement, whether or not such goods were sold by the Dealer. Such warranty service includes any additional warranty policies which Navistar may from time to time establish with respect to goods covered by the Agreement, such as service parts or components, other than vehicles. The Dealer has no authority to obligate Navistar beyond the express terms of any such service part or component warranty policy.

When during the period the Agreement remains in effect, the Dealer repairs or replaces defective parts in fulfillment of the Warranty, Navistar will compensate the Dealer for the cost of a part replaced and labor expense incurred according to Navistar's warranty adjustment policies in effect at the time warranty service is rendered a customer entitled thereto. Navistar reserves the right to pay such compensation or grant a credit in the amount of such compensation to offset any indebtedness owing to Navistar or any of its affiliates.

In the event Navistar determines that warranty service has been made necessary because of the failure of the Dealer making a claim for reimbursement of the cost of such service to assemble or adjust the vehicle or other goods covered by the Agreement properly at the time of its sale, or to perform properly the pre-delivery and after-delivery services established by Navistar, or because of the incorporation by the Dealer of any unapproved modification, accessory item or attachment, then Navistar shall be relieved of its obligation to reimburse the Dealer either for the part installed or for the labor provided.

Navistar will not be obligated to make parts or labor warranty adjustments unless within thirty (30) days from the date the Dealer furnished, or furnished and installed, the new part to replace such defective part, it gives Navistar written notice of the claim under the Warranty.

In the event a lawsuit is commenced against the Dealer alleging that injury, death or property damage was caused by the defective manufacture or design of a product covered by this Agreement, the facts surrounding the sale and service of the Product, the substantive facts of the accident and the manner in which the case is pleaded will be examined in detail. Where the Dealer discloses to Navistar its participation in the events on which the suit is based and requests Navistar to assume its defense and

where acts of misfeasance, malfeasance or nonfeasance by the Dealer and its employees are not involved in the litigation, Navistar will notify the Dealer in writing of Navistar's decision to assume its defense, which decision will not be unreasonably withheld, and to indemnify the Dealer for any resulting judgment or settlement and the Dealer's reasonable costs and expenses incurred in connection therewith from the commencement of the lawsuit, including reasonable attorney fees. The Dealer agrees to cooperate fully with Navistar in the defense of the litigation. Until such time as the Dealer receives written notification of Navistar's decision to assume the defense as aforesaid, the Dealer, and not Navistar, shall be responsible for its defense.

*Field Changes*

10. The Dealer agrees that it will install in accordance with instructions received from Navistar field improvement packages determined by Navistar to be advisable. In reimbursement to the Dealer of the cost of performing this service Navistar will establish either a warranty reimbursement rate or labor hours it deems reasonable for the installation of any such improvement package. If labor hours have been established, Navistar will credit the Dealer with an amount equal to such specified hours multiplied by the appropriate labor reimbursement rate established pursuant to Section 9.

*Sales by Navistar*

11. The Dealer recognizes and understands that Navistar reserves the right to sell, lease or loan the goods covered by the Agreement for use in the Dealer's Trade Area to:

    (a)   The United States Government and any department or agency thereof;

    (b)   State or local governments and any department or agency thereof;

    (c)   Dealers or distributors of Navistar for use by such dealers or distributors in the operation of their business;

    (d)   National users, fleet operators and leasing companies;

    (e)   Manufacturers to be used by them in or with equipment of their respective manufacture or assembly, or the repair thereof, and to distributors of such manufacturers; and

    (f)   Educational or charitable institutions or agencies.

The Dealer also recognizes and understands that Navistar reserves the right to sell, lease or loan the goods covered by the Agreement through:

    (a)   Navistar-owned retail outlets wherever located; and

    (b)   Other dealers of Navistar wherever located.

No commissions will be allowed or paid the Dealer on any sale of the types referred to in this section made by Navistar or any of its dealers or distributors in the Dealer's Trade Area.

When, upon request of Navistar, the Dealer prepares and delivers to the place specified by Navistar any goods sold, leased or loaned by Navistar for use in the Dealer's Trade Area, Navistar will compensate the Dealer for its services at the rates established by Navistar for such purposes and in effect at the time the services were rendered.

*Changes in Design*

12. Navistar reserves the right to make changes in specifications, construction or design of International vehicles and optional equipment at any time in such manner as it may consider necessary or advisable, and any vehicles and optional equipment so changed will be accepted by the Dealer as standard construction in fulfillment of existing orders. Navistar shall not be obliged to furnish the Dealer with such changes on vehicles and optional equipment previously delivered.

*Sales on Credit*

13. When Navistar's terms to dealers provide for the extension of credit on goods covered by the Agreement, Navistar, or an affiliate of Navistar, may at any time place a limit upon the amount of credit that will be extended to the Dealer on such goods and may at any time change any credit limit established by it.

To protect Navistar and its affiliates when credit is extended, and to secure payment of all amounts due or to become due for any obligation now or hereafter owing by Dealer to Navistar or an affiliate of Navistar until all such indebtedness shall have been paid in cash, Navistar hereby retains, and Dealer hereby grants, a security interest under the Uniform Commercial Code or other applicable laws in and to Dealer's inventory of new vehicles purchased hereunder for which credit is extended by Navistar or an affiliate of Navistar, all chattel paper of whatever nature arising out of the sale, lease or other disposition of the above, all repossessions of the above, all credits or other amounts due hereunder in the form of allowances, warranty reimbursements or otherwise, and the proceeds of all of the above. When requested by Navistar, the Dealer will execute and deliver, or cause to be executed and delivered, to Navistar, lien notes or contracts and such other title retention or security instruments or any other documents as may be required by Navistar, on forms acceptable to it, covering goods or other assets then or thereafter in the Dealer's possession and securing any indebtedness owed by the Dealer to Navistar or any affiliate of Navistar. The Dealer agrees that documents evidencing indebtedness of the Dealer, together with all rights thereunder, may be assigned or transferred by Navistar. The Dealer agrees to pay the initial taxes imposed by law upon the privilege of executing such lien notes or contracts or other title retention or security instruments or documents, and if it fails to do so, to reimburse Navistar for the cost of such taxes paid by it. Such notes or contracts shall mature according to the terms in effect at the time of delivery and draw interest or include a finance charge at the rate established by Navistar and specified therein. Regardless of any terms established by Navistar upon goods sold to the Dealer on credit, the Dealer's obligation for goods will become immediately due and payable whenever those goods are resold, leased, or placed in use.

Prior to full payment of the purchase price, the Dealer shall have no right to sell or dispose of any goods delivered under the Agreement, except in the ordinary course of retail trade for their reasonable value and upon the express condition that on or before delivery the Dealer shall secure full settlement from his customer, and the proceeds of such resale, whether in cash, property or an obligation of the customer to the extent owed to Navistar, shall be considered the property of Navistar in lieu of the goods so sold. Cash proceeds of such resale shall be immediately forwarded to Navistar and all other proceeds will be held separately in trust for Navistar and subject to its order.

Nothing herein shall release the Dealer from payment for all goods ordered and delivered under the Agreement, and after delivery to the Dealer said goods shall be held at the Dealer's risk and expense with respect to loss and damage from any cause and taxes and charges of any kind. Should any item of goods subject to the extension of credit be damaged or destroyed, the Dealer shall immediately give Navistar full information regarding such loss or damage and the cause thereof.

The Dealer agrees that it will not place a lien or security interest of any kind on its parts inventory unless a waiver of priority of lien or security interest is given by the lienholder or secured party insofar as the interests of Navistar and any affiliate of Navistar are concerned, or the lien or security interest thereon is subordinated to the interests of Navistar and any affiliate of Navistar.

At any reasonable time, the Dealer will allow Navistar's representatives to enter its premises to examine its books and records with respect to any goods for which it is indebted to Navistar or any affiliate of Navistar, and to inspect and inventory such goods. The Dealer agrees that Navistar shall be entitled to compensation for services performed and expenses incurred in connection with an extension of credit and that a reasonable charge therefor may be incorporated in Navistar's credit terms.

If the Dealer shall at any time default in the payment of the purchase price of any goods delivered to it under the Agreement it hereby gives its irrevocable consent to Navistar's representatives to enter the premises wherever the books and records relating to its business may be located and to examine and audit such books and records to the extent Navistar's representatives may consider necessary and proper to determine fully its financial condition.

*Collateral Security*

14. When the Dealer is indebted to Navistar or to any affiliate of Navistar on past due notes or open account, or for goods resold by the Dealer, or upon its guaranty of the payment of retail notes or contracts that are in default, it shall, when Navistar requests, assign or endorse and promptly deliver to Navistar, for its account or for the account of any affiliate of Navistar or for the account of both, sufficient good accounts or well-secured notes, or other assets, to cover said indebtedness, to be held by Navistar as collateral security. The Dealer agrees to pay a collection fee on the cash collected by Navistar upon such collateral security which fee will be determined at the time the collateral security is assigned.

In case of default in payment of any of said collateral security so delivered, the Dealer agrees to remit cash for the full amount of the same, together with interest, within fifteen (15) days after maturity.

*Finance Plan*

15. Any finance plan which Navistar or an affiliate of Navistar may have in force while the Agreement remains in effect, covering the acceptance from the Dealer of retail contracts, shall be made available to the Dealer upon approval of its application, it being understood, however, that such finance plans may be changed or withdrawn at any time without notice.

**Operating Requirements**

*Dealer Facilities and Activities*

16. In order to establish and conduct its operations on a basis to promote an enduring and profitable business, to obtain a reasonable portion of the sales potential of trucks, parts and maintenance in its Trade Area for the goods covered by the Agreement and to render the service essential to the maintenance of the reputation and customer acceptance of International vehicles, the Dealer agrees:

    (a)  Capital Requirements

        (1)  To provide and maintain physical facilities commensurate with the sales possibilities and service needs in the Dealer's Trade Area, including the following:

            (i)  A building or buildings and outside area of acceptable appearance and sufficient size for properly displaying, handling and warehousing vehicles and other goods delivered to it under this Agreement and for other operating requirements.

            (ii)  A Maintenance center adequate in size to meet the service requirements of the user-customers located in the dealer's trade area including service tools, and equipment, and a library as recommended by Navistar. Specific service tools required to service new truck models and/or components will be shipped and invoiced to the Dealer.

            (iii)  Maintenance parts stocking facilities and equipment necessary for the attractive display and efficient storage and handling of parts, attachments and accessories.

            (iv)  Office furniture and equipment that will enable it to maintain complete and accurate records of its business in keeping with sound business practice.

        (v)    Product and maintenance signs recommended and approved by Navistar, in good condition at conspicuous and appropriate locations inside and outside of the retail establishment referred to on page 3 of the Agreement, identifying the retail establishment as an authorized Sales and Maintenance establishment for the goods covered by the Agreement.

  (2)    To provide at all times sufficient working capital and net worth to enable it to fulfill properly all of the Dealer's responsibilities and duties under the Agreement. The Dealer agrees that, whenever the actual net worth or working capital of the Dealership is in the opinion of Navistar inadequate to properly fulfill all the responsibilities of the Dealership commensurate with the potential of its Trade Area, the Dealer shall retain in the business a reasonable percentage of the Dealer's net profit until an adequate level of working capital and/or net worth is attained.

(b)   Sales Requirements: The Dealer further agrees:

  (1)    To achieve a reasonable share of the market, for the goods and services covered by the Agreement, in the Trade Area served by the Dealer's location. In gauging the Dealer's performance under this Subsection, Navistar will compare the Dealer's market penetration and percent of sales to objectives that may be established for the Dealer by Navistar from time to time with those of other dealers of Navistar selling like goods, and will also compare the Dealer's market penetration with those of dealers in goods which are competitive in price and characteristics to those offered by the Dealer. In each case Navistar will, as far as possible, select comparative dealers from the immediate geographical areas similar to that of the Dealer. Navistar will also measure the Dealer's performance by penetration figures, published by organizations accepted by the automotive and truck industry, applicable to the normal area served by the Dealer and applicable also to larger regions including the national market. In any event, Navistar will consider any factors relevant to the Dealer's performance as an entity, so that while the dominant tests are to be objective ones, equities of the Dealer shall temper the results of such tests.

  (2)    To promote aggressively the sale of each item of goods covered by the Agreement of the type for which a demand exists within the Trade Area served by the Dealer and participate in promotional programs that may be announced by Navistar from time to time.

  (3)    To advertise and promote goods covered by this Agreement, to use the promotional and advertising material provided for in Section 24 of the Agreement and be guided by the suggestions and requests of Navistar in its advertising and sales promotion activities.

  (4)    To maintain an inventory of International vehicles, optional equipment, maintenance parts, and accessories at or above the minimum levels established by Dealer Central and in keeping with the sales possibilities in its Trade Area for all goods covered by the Agreement.

  (5)    To cooperate with Navistar by placing orders for goods in accordance with advance ordering programs announced by Navistar.

  (6)    To participate in demonstration programs that may be announced by Navistar from time to time and maintain demonstration vehicles at or above the minimum levels established by Navistar in stock in addition to new unsold vehicle inventory of the type for which a demand exists within the Dealer's Trade Area.

(7) To maintain an effective prospect system for the vehicles covered by this Agreement including a current list of prospective purchasers of International vehicles that will be furnished to Navistar upon request.

(c) Management Requirements: The Dealer further agrees:

(1) To engage, train and maintain sales, maintenance and accounting personnel sufficient to obtain a reasonable share of the sales possibilities in its Trade Area for the goods covered by the Agreement, to maintain promptly and efficiently International vehicles in use in that area and to maintain proper and accurate accounting records.

(2) To provide financial, accounting, inventory, sales, and maintenance reports provided for in the Agreement within the time period specified.

(3) To maintain its retail establishment at the place shown in the heading of the Agreement, and not to move to a different location nor to establish another sales office, maintenance center, maintenance parts facility, or new or used vehicle lot without the prior written approval of Navistar.

(4) To cooperate with Navistar in the conducting of the Dealer performance review provided for in Section 26 of the Agreement.

(5) To investigate and resolve all complaints from user-customers of International vehicles and to report in detail to Navistar those complaints which the Dealer is unable to resolve.

(6) To comply with Navistar's policies regarding the pre-delivery and after-delivery maintenance of new vehicles covered by the Agreement.

(7) To provide warranty maintenance to each user of goods of the type covered by the Agreement who shall be entitled to such service.

(8) To attend Navistar-conducted or sponsored product, sales and maintenance meetings and use training materials and programs which may be offered by Navistar from time to time.

(9) To supply delivery information to Dealer Central immediately upon delivery of each vehicle to the customer.

(10) Other: _____

_____

*Use of Trade Names, Trademarks and Signs*

17. The Dealer agrees not to use the words "International", "Navistar" or any other trademarks, service marks, certification marks or trade names (hereinafter "Marks"), whether or not registered, that are owned by Navistar, as part of its firm, trading or corporate name without the prior written approval of Navistar. The Dealer is hereby licensed to use Navistar's Marks in the normal course of distributing Navistar's products purchased and performing related services hereunder, and such use shall be only as to Navistar's products purchased hereunder and related services and shall be only of Navistar's Marks directly referring and or applicable to the particular Navistar products so purchased or service provided in connection therewith. This license does not authorize Dealer to purchase objects bearing Navistar's Marks from unlicensed sources or to apply, or have applied, Navistar's Marks to objects that will be offered for sale. The Dealer agrees not to use, and recognizes it is not authorized to permit its customers to use, except as may be approved by Navistar, any Navistar Marks, either alone or in conjunction with other words and or designs, numbers or symbols confusingly similar to Navistar's Marks, on or with any purchase order or other forms, printed material, business cards, signs and other advertising and or promotional materials, invoices, letterhead or service offered.

12

Upon termination of this Agreement, the Dealer will immediately cease and desist from holding himself out to the public in any fashion or manner as an authorized Dealer or Servicer of Navistar's products and will promptly terminate and discontinue telephone, business and other directory listings which refer to the Dealer as an authorized Dealer and or Servicer of Navistar products.

The Dealer further agrees to remove or obliterate, within thirty (30) days of the effective date of the termination of this Agreement, all signs and other advertising material in and about the Dealer's place of business which refer to or identify the Dealer as a dealer of Navistar's products and or services whether such signs and advertising material were acquired at the Dealer's expense or otherwise. If, upon termination of this Agreement, the Dealer delays or refuses to comply with the provisions of this paragraph, the Dealer agrees that Navistar and or its agent has the right to enter upon or into the Dealer's premises at any reasonable time or times and to do all acts necessary to accomplish such removal without incurring any liability to the Dealer in so doing; provided, that Navistar shall exercise reasonable care not to injure said premises unnecessarily. If the Dealer refuses Navistar or its agent such access and right of entry, the Dealer will reimburse Navistar for all costs and expenses incurred in any litigation by Navistar to require compliance by the Dealer. The Dealer agrees to save and hold Navistar harmless from any liability, loss, cost, expense, or inconvenience to the Dealer arising out of or connected with the removal of such signs and/or advertising materials.

| Estimates, Inventory and Delivery Reports | 18. To help Navistar to plan its manufacturing operations and to make the necessary commitments for materials and labor, the Dealer agrees that whenever requested it will promptly furnish to Navistar, in the manner Navistar requests, up-to-date and accurate information regarding new goods in its inventory, unfilled orders, and estimates of its future sales of new vehicles. Such estimates shall not be binding either on the Dealer or Navistar but will be used for information purposes only. |

The Dealer also will maintain a record relating to each new International vehicle sold by it, showing the date of delivery thereof, the name and address of the buyer and the chassis number of the vehicle sold.

The Dealer will also maintain accurate parts inventory control records to assist it in maintaining an inventory of parts to provide proper maintenance to user-customers in its trade area of the goods covered by the Agreement.

At any time, upon request, the Dealer will give Navistar's representatives full information regarding goods on hand and goods sold.

| International Truck Service Parts | 19. Navistar makes available for purchase by the Dealer maintenance parts identified as genuine International truck maintenance parts which are designed for use on International vehicles. |

The Dealer agrees that it will not sell or offer for sale for use on International vehicles or use in the repair of those International vehicles, as genuine International truck maintenance parts, any part or parts except those manufactured by or for Navistar, or approved by Navistar and designed for use on International vehicles. Further, the Dealer agrees that it will inform its customers by appropriate notation on the invoice which parts are not genuine International parts where such parts are sold for use or repair of International vehicles.

| Contingencies Affecting Delivery to the Dealer | 20. Navistar recognizes the desirability of filling orders promptly and agrees that it will at all times use its best efforts to make shipments on or before the dates specified in orders accepted from the Dealer. Navistar, however, shall not be responsible for failure to deliver goods on time or to fill orders when such delay or failure to deliver shall be the result of causes reasonably beyond Navistar's control, including, but not by way of limitation, fire or other elements; war, riot, strikes or labor disturbances, shortages of material, any order, decree, law or regulation of any court, government or governmental agency, or by the demand for any goods exceeding Navistar's available supply. |

13

If the demand from all sources for any of the goods covered by the Agreement shall at any time exceed Navistar's available supply of such goods, the quantity of such goods to be allotted to the Dealer, in order to provide for the equitable distribution of the supply, shall be determined solely by Navistar. In such event Navistar shall not be liable for having failed to furnish the Dealer with all or any of the goods covered by orders accepted from it.

*Delivery, Risks of Shipment and Routing of Shipments*

21. Delivery of goods by Navistar to a carrier consigned to the Dealer, or delivery to any person other than a Navistar employee for the account of the Dealer shall constitute delivery to the Dealer. After delivery, Navistar shall not be responsible for any loss, damage or delay during transportation. All claims for loss or damage in transit shall be made by the Dealer against the carrier of the goods.

Navistar reserves the right to route all shipments. Whenever Navistar permits the Dealer to route any shipment, the Dealer agrees that it will select only carriers having the necessary qualifications under applicable federal and state laws and regulations, permitting them to carry the goods to be transported over the routes to be used.

The Dealer to be entitled to receive a vehicle at the plant where it is manufactured (Will Call Delivery) must so specify in its purchase order. When a vehicle for which Will Call Delivery has been specified is available for delivery to the Dealer, the vehicle will be placed in an area designated by Navistar as a Will Call Delivery center. Placing of the vehicle in such Will Call Delivery center will constitute delivery to the Dealer and pass title to the Dealer, and thereupon the purchase price of the vehicle will become due and payable according to the terms and conditions of the sale. While in the Will Call Delivery center, responsibility for and risk of loss of the vehicle will be assumed by Navistar.

If a Dealer's order for any of the goods covered by the Agreement specifies "Will Call", Navistar will notify the Dealer of the place and date for calling for the goods. Navistar reserves the right to ship via a carrier such goods that are not called for at such place within seven (7) days of the date specified by Navistar that the goods are available. Transportation charges on such shipment may be collect or prepaid but in any case the Dealer agrees to hold Navistar harmless for any transportation charges it incurs. Upon delivery to such carrier, Navistar shall have no responsibility for risk of loss, damage or delivery of the vehicle during transportation.

*Storage*

22. The Dealer shall properly store and care for all goods purchased under the Agreement and protect the same from injury or damage from any cause.

*Insurance*

23. The Dealer shall at all times keep the goods for which it is indebted to Navistar or to any affiliate of Navistar covered by fire and extended coverage insurance for their fair insurable value, in a company or companies approved by Navistar, with loss payable to Navistar and any other affiliate designated by Navistar as their interests may appear. Such loss payable clause shall include provisions for not less than ten (10) days notice being given to the loss payee prior to cancellation of the insurance. The Dealer shall deliver to Navistar policies or certificates of insurance issued by the insurers evidencing such insurance.

Insurance provided under any dealer floor plan terms of Navistar shall be deemed to comply with this requirement as to goods held by the Dealer under those floor plan terms.

New International vehicles which are delivered to the Dealer on will call orders at plants, truck sales processing centers, regions or other Navistar locations must be covered with collision insurance in a company or companies and in an amount acceptable to Navistar.

*Advertising and Sales Promotion*

24. In order to stimulate sales of its products, Navistar will advertise International vehicles in various advertising media selected by it, to the extent it considers practical and desirable.

Navistar agrees that it will make available to the Dealer advertising literature, catalogs, folders, mailing pieces, newspaper mats or stereotypes, signs and other advertising material or equipment designed to assist the Dealer in promoting the sales of goods covered by the Agreement. Navistar reserves the right, however, to make reasonable charges to the Dealer for any such advertising material or equipment (including charges for postage or transportation) supplied to it. Navistar also reserves the right to make reasonable charges to the Dealer for any truck registration or owners list furnished to it. Navistar may furnish certain advertising material to the Dealer without charge, but may limit the quantities of such advertising material to quantities which in Navistar's judgment are commensurate with the Dealer's operations and sales possibilities. Navistar will also extend to the Dealer sales promotion assistance and suggestions.

Navistar may from time to time establish advertising plans which will be available to its vehicle dealers, it being understood, however, that Navistar may change or withdraw any such plan at any time.

*Accounting Records and Financial Reports*

25. The Dealer agrees to maintain accounting records that will at all times accurately reflect the financial condition of its business and enable it to prepare monthly operating statements. The Dealer agrees to furnish financial (balance sheet) and operating (profit and loss) statements to Navistar, and any designated affiliate of Navistar, in the format prescribed by Navistar via the DCN, quarterly or otherwise as requested by Navistar. In addition, the Dealer will send its fully detailed and audited annual financial and operating statements to CDA and any designated affiliate of Navistar within sixty (60) days after the close of its fiscal year.

*Dealer Performance Review*

26. In order that a satisfactory level of Dealer sales and service performance may be maintained, Navistar will from time to time review with the Dealer the degree to which it has satisfied the performance and operating requirements established in the Agreement. The Dealer agrees to cooperate with Navistar by making available to it, at such time as may be mutually convenient for such review, those sales, service and financial records which are necessary to adequately analyze the operation of the Dealer's business and by assuring, upon the occasion of a personal review, the presence of those dealership personnel whose attendance would contribute to the overall value of the review. Conclusions and recommendations developed from the review shall be incorporated into a written report which shall be supplied to the Dealer for its study and the initiation by it of appropriate action.

## Termination of Agreement

*Termination by Mutual Consent or by Advance Notice*

27. Unless the Agreement is terminated under Section 28 hereof, it shall remain in effect until it is terminated by one or both of the parties as provided in this section.

(a) The Dealer may at any time terminate the Agreement by giving notice of termination to CDA. Such notice of termination shall specify the date upon which the termination is to become effective and not less than thirty (30) days shall intervene between the giving of such notice and such effective date.

(b) The Agreement may be terminated at any time by mutual written consent, the effective date of termination to be as mutually agreed upon. The consent in behalf of Navistar shall be executed by CDA.

(c) Navistar may terminate the Agreement at any time by giving to the Dealer notice of termination signed by CDA. Such notice of termination shall specify the date upon which the termination is to become effective and not less than ninety (90) days shall intervene between the giving of such notice and such effective date. No such notice shall be given by Navistar unless the Dealer shall have breached the duties, obligations of responsibilities imposed upon it by one or more of Sections 3, 9, 10, 16, 17, 18, 19, 22, 23, 24, 25 or 26 of this Agreement, and unless the Dealer shall first have been apprised of such breach and given a reasonable opportunity to rectify it.

Notice of termination shall be in writing. When issued by Navistar, notice may either be given to the Dealer personally or forwarded to it by mail. When issued by the Dealer, notice shall be mailed to the CDA.

Upon the effective date of termination, all indebtedness of the Dealer to Navistar or to any subsidiary of Navistar shall become immediately due and payable and, unless otherwise agreed between the parties, all unfilled orders accepted from the Dealer shall be deemed cancelled without liability on the part of either party. Upon the issuance of a notice of termination by either party, or upon mutual agreement to terminate, Navistar, at its option, may establish terms of cash with order or C.O.D. on any or all goods thereafter delivered to the Dealer.

*Termination by Immediate Notice*    28. While it is the hope and expectation of the parties that the Agreement will create an enduring and mutually profitable and satisfactory relation, it is recognized that circumstances may arise making it necessary for Navistar or the Dealer to take steps to protect their interests or making it impracticable for this Agreement to continue, and under which it should be immediately terminated. In order that those circumstances may be clearly understood, it is agreed that:

(a) Notwithstanding the provisions of Section 27,

(1) Navistar may at its option by written notice signed by CDA terminate the Agreement effective at once, or

(2) Navistar or any affiliate of Navistar may without notice declare immediately due and payable any indebtedness of the Dealer, to Navistar or any such affiliate, on goods sold to the Dealer, and may immediately and without notice repossess such goods as well as any other goods or assets in the Dealer's possession with respect to which Navistar or any affiliate of Navistar has a lien, encumbrance or security interest, or

(3) Navistar may without notice establish terms of cash with order or C.O.D. on goods thereafter delivered to the Dealer, or

(4) Navistar may exercise any other legal remedies that are available to it,

in the event of the happening of any of the following:

(i) The Dealer defaults in the payment of any obligations owing to Navistar or to any affiliate of Navistar, or upon demand fails to account for the proceeds of the sale of goods for which it is indebted to Navistar or to any affiliate of Navistar,

(ii) The Dealer fails to comply with Section 13 or Section 14 of the Agreement regarding Sales on Credit and Collateral Security,

(iii) The Dealer sells or makes an attempted sale or other disposition of any goods purchased under the Agreement, upon which any part of the purchase price is unpaid, other than in the ordinary course of retail trade,

16

(iv) Without prior approval of Navistar, the Dealer sells or makes an attempted sale in bulk of all or a major portion of its inventory purchased from Navistar, whether or not any part of the purchase price therefor remains unpaid,

(v) Loss or damage to goods in which Navistar's interest has not been protected by insurance as required by Section 23 of the Agreement,

(vi) An assignment by the Dealer for the benefit of creditors,

(vii) The admitted insolvency of the Dealer, or any member of the Dealer's firm if a partnership, or the institution of voluntary or involuntary proceedings in bankruptcy or under other insolvency law, or for an arrangement with credits or for corporate reorganization or for receivership or dissolution of the Dealer,

(viii) The assignment or attempted assignment of the Agreement, or of any interest therein or any right thereunder, by the Dealer without Navistar's written consent,

(ix) If, without the written consent of Navistar signed by CDA, the Dealer's retail establishment shall remain closed for the conduct of sales and operations during regular business hours for more than five (5) consecutive days,

(x) If the Dealer creates, or suffers to be created, a security interest or lien of any kind upon any goods purchased under this Agreement for which any part of the purchase price is unpaid, or upon any goods in which Navistar or any affiliate of Navistar has a security interest,

(xi) If the Dealer is a corporation, any change in the principal officers, directors, management, or stock ownership, which, in the opinion of Navistar will effect a substantial change in the operation, management, or control of the dealership,

(xii) If any dispute, disagreement or controversy shall arise between or among principals, partners, managers, officers or stockholders of the Dealer which, in the opinion of Navistar, may adversely affect the operation, management, reputation, business or interest of the Dealer or the business or interest of Navistar or reputation of Navistar's products,

(xiii) The conviction of the owner, officer, principal stockholder, or partner of any crime, which, in the opinion of Navistar, adversely affects the interest of the Dealer or Navistar,

(xiv) The falsification of any records or reports by the Dealer,

(xv) The making of a questionable or improper payment to a third party by the Dealer.

(b) The exercise of one right or remedy shall not constitute an election or preclude Navistar from exercising all other rights or remedies available to it under the law or provided herein, and the acceptance by Navistar or any affiliate of Navistar of the payment of any past due indebtedness owing to either of them shall not constitute a waiver of any of the rights of Navistar under this section arising out of the existence of such past due indebtedness if such rights are exercised promptly after such acceptance;

(c) Either the Dealer or Navistar may at its option by written notice terminate the Agreement, effective at once, if any state or jurisdiction where this Agreement is to be performed requires a license of the Dealer or Navistar and

    (1) The Dealer or Navistar fails to secure or maintain or renew such license, or

    (2) Such license of the Dealer or Navistar is suspended or revoked for any reason.

(d) Since this is a personal agreement, it shall automatically terminate –

    (1) Upon the death or incapacity of the Dealer if the Dealer is an individual,

    (2) Upon the death or incapacity of a member of the Dealer's firm if the Dealer is a partnership, or

    (3) Upon any change in the membership of the Dealer's firm if the Dealer is a partnership;

(e) Any change in the business structure (individual, partnership or corporation) of the Dealer as shown on page 3 of the Agreement will automatically terminate the Agreement; and

(f) The termination of the Agreement under this section shall, unless otherwise agreed between the parties, cancel all unfilled orders accepted from the dealer, without liability on the part of either party.

**Deliveries after Termination**

29. It is understood that circumstances may exist under which it will be to the mutual advantage of the parties to have goods of type covered by the Agreement delivered to the Dealer after the termination of the Agreement in fulfillment of orders placed by the Dealer prior to the effective date of termination. In recognition of this fact the parties agree that the delivery to the Dealer after the termination of the Agreement of goods covered by orders received from the Dealer prior to the effective date of termination or maintenance parts covered by orders received after the effective date of termination shall not be construed as an extension or renewal of the Agreement or as a waiver of the termination, but nevertheless all such transactions shall be governed by terms identical with the terms of the Agreement.

**Succession of Dealer**

30. On termination of the Agreement, pursuant to Section 28(d), by reason of the death or incapacity of the Dealer, if the Dealer is an individual, or a partner, if the Dealer is a partnership, or on termination of the Agreement, pursuant to Section 28(a)(4)(xi) by reason of the death or incapacity of one of the principal officers, directors, management or stockholders, if the Dealer is a corporation (said individual, partner, principal officers, directors, management or stockholders hereinafter referred to in this Section 30 as "the deceased or incapacitated Dealer"), Navistar will, if the Dealer has so requested in writing delivered to Navistar during the lifetime or prior to the incapacity of such deceased or incapacitated Dealer, offer an interim sales and service agreement limited by appropriate amendment to a term of two years, but subject to earlier termination as provided in said agreement, to any nominee(s) the Dealer desires to continue the Dealer's business after such death or incapacity provided that such nominee(s): (a) has, at the time of nomination and at the time of death or incapacity of the deceased or incapacitated Dealer, demonstrated operating qualifications satisfactory to Navistar in the course of active, substantial and continuing participation in the management of the Dealer's organization, (b) possesses or is able to acquire within a reasonable time, but not to exceed 60 days after such death or incapacity, capital and facilities that are satisfactory to Navistar, (c) will, in Navistar's judgment, be able to exercise as much control over the operations and affairs of the dealership as the deceased or incapacitated Dealer exercised and (d) provides Navistar with immediate written notice upon the death or incapacity of the deceased or incapacitated Dealer of his desire, legal ability and willingness to execute such an interim sales and maintenance agreement with such execution to occur within not more than 30 days after such death or incapacity.

At least 90 days before the expiration of the interim agreement Navistar will determine whether or not the nominee(s) possesses the qualifications, capital and facilities to qualify for the appropriate, standard sales and maintenance agreement then in effect and, if so, Navistar will offer such appropriate standard agreement to such nominee(s).

In addition to Navistar approval, the nominee(s) must also have at the time of nomination and at the time of death or incapacity of the deceased or incapacitated Dealer approval of the surviving partner(s) if the Dealer is a partnership and principal officers, directors and stockholders if the Dealer is a corporation and must provide, at Navistar's request prior to execution of the interim sales and service agreement, evidence satisfactory to Navistar that the settlement of the estate or business affairs of the deceased or incapacitated Dealer would not prevent the nominee(s) from becoming the successor Dealer under said interim sales and maintenance agreement.

The termination of this Agreement for any reason other than the death or incapacity of the deceased or incapacitated Dealer will cancel all succession agreements between the Dealer and Navistar and will relieve Navistar from its agreement to offer an interim sales and maintenance agreement to the nominee(s).

*Deferral of Termination in the Event of Death or Incapacity*

31. In the event of the death or incapacity of the Dealer, if the Dealer is an individual, or the death or incapacity of a partner, if the Dealer is a partnership, Navistar will, provided,

    (a) A successor agreement pursuant to the above Section 30 has not been executed and approved, and

    (b) written request therefor is made within thirty (30) days of such death or incapacity by the legal representative(s) of the deceased or incapacitated person and all other persons having an ownership interest in the business, and

    (c) necessary approval to continue to operate the business is obtained from the proper legal authorities,

defer the termination and continue to operate under the provisions of the Agreement, for a period, to be determined by Navistar, of not less than ninety (90) days nor more than one year from the date of such death or incapacity, during which period the family or the family and other partners may attempt to reorganize the dealership to the satisfaction of Navistar so that the reorganized business may continue as a dealer, negotiate a sale to another dealer satisfactory to Navistar, or liquidate the dealership in an orderly manner. In the event the effective date of termination is extended as provided herein, the arrangement shall automatically become terminated at the expiration of such period.

*Repurchase of Dealer's Stock and Signs Upon Termination of the Agreement*

32. Upon termination of the Agreement, Navistar agrees to repurchase, and the Dealer agrees to resell and deliver F.O.B. Navistar's designated location, or other F.O.B. point agreed upon between the parties, all new, current, complete, undamaged, unused and salable vehicles of the current model year announced by Navistar, and equipment on hand in the Dealer's place of business that have not been altered other than by Navistar. The prices to be paid by Navistar shall be the dealer prices at which they have been charged to the Dealer (but not more than Navistar's current dealer prices) less all discounts allowed.

In addition, Navistar will make an allowance to the Dealer for freight on such vehicles based on the lowest common carrier rates in effect on the date of termination from the plants where the vehicles were produced to the Dealer's town or the Regional Office, whichever is less. If, however, freight equalization points are applicable to the shipment of any vehicle on the date of termination, the allowance with respect to such vehicle shall not exceed freight at such rates from equalization point nearest the Dealer's town to the Dealer's town or from such equalization point to the Regional Office, whichever is less; and if Navistar has established a delivery charge or a maximum transportation with respect to such vehicle shall not exceed the amount so established and in effect on the date of termination.

Navistar agrees to repurchase and the Dealer agrees to resell and deliver to Navistar, all other current vehicles which are not of the most current model year or not in new or salable condition at prices discounted from the Dealer's cost and agreed upon by the Dealer and Navistar. If Navistar and the Dealer are unable, within thirty (30) days from the effective date of termination, to agree on the amount of discount from the Dealer's cost, such discount shall be determined by Navistar and two independent appraisers selected by Navistar and the Dealer jointly.

Upon termination of the Agreement, Navistar will repurchase from the Dealer maintenance parts, identified as returnable and marked with an asterisk in the current parts price books, purchased as maintenance parts from Navistar under this and prior agreements and which are on hand in the Dealer's place of business on the effective date of termination. The parts subject to repurchase must be unused and in physical condition and appearance, including packaging, suitable for reshipment by Navistar to other dealers. Navistar will not repurchase parts whose condition may have deteriorated while in the Dealer's inventory, such as, paint, lubricants, rubber pieces, etc. but otherwise will repurchase parts as previously described in this section. The price to be credited or paid will be the price to dealers current at the time the repurchased parts are received by Navistar, less policy discounts applicable at that time, whether or not previously allowed to the Dealer, plus 5% of the price to dealers for packaging and preparation for return to the destination designated by Navistar. Navistar will specify method of shipment and will be responsible for transportation costs. Navistar shall be released from its obligation to repurchase maintenance parts if the Dealer does not submit its list of parts to Navistar within thirty (30) days after the effective date of the termination and return its parts, authorized to be returned, within thirty (30) days after notification to return is received from Navistar.

Upon termination of the Agreement, Navistar also agrees to purchase from the Dealer and the Dealer agrees to sell and deliver to Navistar the primary business signs on the Dealer's building or premises that are in good condition and of a type authorized by Navistar. The amount that will be allowed for each primary sign will be the amount that was paid by the Dealer for such sign, exclusive of any amount paid by Navistar from any cooperative advertising fund, less annual depreciation of 20 percent of the amount paid by the Dealer.

Upon termination of the Agreement, the Dealer also agrees to return to Navistar, if requested, within thirty (30) days after the effective date of termination, any or all catalogs, price lists, maintenance manuals and bulletins, owner's manuals and current advertising material, which have been furnished to the Dealer by Navistar. Any charges (except for transportation, page service and binders) paid by the Dealer to Navistar for such material will be allowed to the Dealer when such material is returned to Navistar.

Amounts payable to the Dealer under this section will not be payable until the Dealer has complied with all applicable provisions of law relating to bulk sales of merchandise and has submitted evidence satisfactory to Navistar that all goods to be repurchased by it are free and clear of all liens and encumbrances, other than liens and encumbrances of Navistar or any affiliate corporation of Navistar on such Dealer's notes or account or other obligations to Navistar or to any affiliate corporation of Navistar, at Navistar's option.

Navistar shall be released from its obligation to repurchase any of the foregoing items, except maintenance parts, which the Dealer is unable to deliver to Navistar within thirty (30) days after termination.

The provisions of this Section 32 shall not apply to those terminations arising out of the substitution of a superseding agreement for this Agreement.

**General Provisions**

| | |
|---|---|
| *Dealer Not Navistar's Agent* | 33. The Dealer is not Navistar's agent in any respect and is not authorized to incur any obligations or make any promises or representations in its behalf. |

*Parties Bound, Effect of Partial Invalidity and Assignment*

34. The Agreement shall be binding upon the parties hereto, their heirs, executors, adminstrators, successors and assigns.

If any provision of the Agreement, or the application of such provision, shall be held illegal or unenforceable, the remainder of the Agreement or the application of such provision to other persons or circumstances shall not be affected thereby.

This is a personal agreement, involving mutual confidence and trust, and it may not be assigned by either party without the written consent of the other party except that Navistar may, however, assign the Agreement to any of its affiliates or affiliated corporations without the consent of the Dealer.

*Agreement Complete*

35. This Agreement supersedes and terminates all previous sales and maintenance agreements between the parties pertaining to the sale of the goods covered by this Agreement. The rights of either party pertaining to goods sold by Navistar to the Dealer under the previous sales and service agreements will be determined by the provisions of this Agreement. There are no oral or collateral agreements or understandings affecting the Agreement except for those conditions, terms and agreements governing extension of credit to the Dealer. When authorized by Navistar's principal executive offices, CDA may enter into written agreements with the Dealer, which are not inconsistent with any provision of the Agreement, supplementing the Agreement, but no representative of Navistar, other than one of its corporate officers, is authorized in its behalf to modify, change or waive any of the provisions of the Agreement or to change, add to (except by the filling in of blank lines and spaces) or erase any of the printed portion of the form upon which the Agreement is prepared.

No waiver by Navistar of any default in the performance of the Agreement by the Dealer shall apply to or be deemed a waiver of any prior to subsequent default hereunder.

The copy of the Agreement retained by Navistar shall be considered the original and shall control in case of any variation between it and the duplicate retained by the Dealer.

*Approval of Agreement*

36. The Agreement shall become effective as of the date it is stated in the heading of the Agreement to be effective when it is fully executed by the parties, approved in writing thereon by CDA, and when a copy so executed and approved is delivered to the Dealer.

In witness thereof, the parties hereto have executed the Agreement in duplicate.

## DEALER

Firm Name _John Meier Motor Company_

By _John A Meier_

Official Capacity or Title _President_

## NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

By _____
(Navistar Representative)

Credit Approval _____
(Finance Sales)

Approved this ___26TH___ day of ___October___, 19_87_

By _____
(Central Dealer Administration)

21

08CV4162
JUDGE MORAN
MAGISTRATE JUDGE ASHMAN

PH

# EXHIBIT B



INTERNATIONAL TRUCK AND ENGINE CORPORATION

4201 WINFIELD ROAD, P.O. BOX 1488, WARRENVILLE, IL 60555

TRUCK GROUP

October 22, 2007                                        **Certified Mail # 7004 1160 0005 7617 5518**

**John Meier Motor Co.**
Suzanne Thurman – General Manager
213 Truman Blvd.
Crystal City, MO  63019

Dear Ms. Thurman:

**John Meier Motor Co. ("JMMC")** is hereby notified that pursuant to Section 27 (c) of your J-80 Dealer Sales/Maintenance Agreement ("Agreement") dated October 26, 1987, International Truck and Engine Corporation ("International"), deems **JMMC** to be in breach of the following sections of that Agreement:

***Section 16 – Subparagraph (a) (1) (i)*** *– A building or buildings and outside area of acceptable appearance and sufficient size for properly displaying, handling and warehousing vehicles and other goods delivered to it under this Agreement and for other operating requirement.*

***Section 16 – Subparagraph (a) (1) (ii)*** *–A Maintenance center adequate in size to meet the service requirements of the user-customer located in the dealer's trade area including service tools, and equipment, and library as recommended by International...*

***Section 16 – Subparagraph (a) (1) (iii)*** *– Maintenance parts stocking facilities and equipment necessary for the attractive display and efficient storage and handling of parts, attachments and accessories.*

***Section 16 – Subparagraph (a) (1) (v)*** *–Product and maintenance signs recommended and approved by International, in good condition at conspicuous and appropriate locations inside and outside of the retail establishment...*

During Dealer Operations' January 22, 2007 visit to your location in Crystal City, MO, it was noted that your facility was in poor condition. It was noted that there are letters missing from the name John Meier on the outside of your facility and the color does not match the Dealer Standards approved gray color-scheme. The identification (ID) does not meet our standards either. The shop is small, and looked dark and dirty. The parts area does not meet the requirements from our Agreement either. There is no black top, only gravel, surrounding the building. We also noticed old International trucks parked on the front and side section of the lot, which looked like the trucks were being used for scrap. This is clearly not the image that International wants to portray.

Ms. Suzanne Thurman
John Meier Motor Co.
October 22, 2007
Page 2

JMMC's facility has not complied with the requirements to meet Dealer Standards as outlined in our dealer facility guide. This facility is aging, in need of renovation, does not meet International Dealer Facilities Standards and is too small to adequately service the truck population in JMMC's area of responsibility.

**This facility is poor in appearance and inadequate and must be expanded and improved.**

*<u>Section 16 – Subparagraph (a) (1) (iv)</u> – Office furniture and equipment that will enable it to maintain complete and accurate records of its business in keeping with sound business practice.*

As of October 19, 2007, **JMMC** did not have any registered users for International's Dealer E-mail System, the primary vehicle for disseminating **<u>critical and time-sensitive information</u>** to the dealer body. For example, **Product Pricing Letters** are sent as needed or as soon as they are ready to be released.

**In keeping with sound business practice, JMMC should have registered users for the Dealer E-mail system. How can a dealer perform at all without this?**

*<u>Section 16 – Subparagraph (a) (2)</u> – To provide at all times sufficient working capital and net worth to enable it to fulfill properly all of the Dealer's responsibilities and duties under the Agreement...*

Effective August 12, 1999 Navistar placed JMMC on a cash-with-order basis and finance hold due to non-payment of the open account.

**Not providing sufficient working capital is in violation of the Agreement and must be rectified.**

*<u>Section 16 – Subparagraph (b) (1)</u> - To achieve a reasonable share of the market, for the goods and services covered by the Agreement, in the Trade Area served by the Dealer's location...*

During the period of August 2006 through July 2007 a total of **66 Class 5-7** trucks were registered in **JMMC's Trade Area. JMMC** sold only **6** of these units for a **7.6% Class 5-7 "In market"** penetration versus the region's industry share of **23.8%.**

During the period of August 2006 through July 2007 a total of **10 LCF** trucks were registered in **JMMC's Trade Area. JMMC** sold **0** of these units for a **0.0% Class 5-7 "In market"** penetration versus the region's industry share of **4.4%.**

**"In-market" penetration is unacceptable and must be improved.**

*<u>Section 16 – Subparagraph (b)(2)</u> – To promote aggressively the sale of each item of goods covered by the Agreement of the type of which a demand exists within the trade area served by the dealer and participate in promotional programs that may be announced by International from time to time.*

As of fiscal year-to-date 2007 (November 2006 through September 2007), JMMC delivered **0** Medium trucks (**0** LCF and **0** Class 5-7) versus a year-to-date DTU objective of **23** units, or **0.0%** of plan, and **0** **Class 8-Severe Service** versus. and year-to-date DTU objective of 1 or **0.0%** to plan.

For fiscal year 2006 (November 2005 through October 2006), JMMC delivered **7** Medium trucks versus a DTU objective of **26, or 26.9%** to plan.

**Performance in new truck deliveries is unacceptable and must be improved.**

Ms. Suzanne Thurman
John Meier Motor Co.
October 22, 2007
Page 3

As of fiscal year-to-date 2007 with month ending September, JMMC had **$59,973** in dealer parts purchases verses a plan of **$95,886** YTD or **62.5%**.  For fiscal year 2006 (November 2005 through October 2006), JMMC had **$96,568** in dealer parts purchases verses a plan of **$112,500** YTD or **85.8%**. **JMMC** parts purchases have declined continue to decline, and have been below Plan for the past three years.

**Performance in Dealer Parts Purchases is unacceptable and must be improved.**

***Section 16 – Subparagraph (b) (4)*** *- To maintain an inventory of International vehicles, optional equipment, maintenance parts, and accessories at or above the minimum levels established by Dealer Central and in keeping with the sales possibilities in its Trade Area for all goods covered by the Agreement.*

As of October 18, 2007, **JMMC** had **0 Class 5-7** and **0 LCF** trucks in stock versus a requirement of **10**, and **0** on order.  **JMMC** had **0 Severe Service** trucks in stock versus a requirement of **3**, and **0** on order.

**This stocking level is inadequate and must be improved.**

***Section 16 – Subparagraph (b) (5)*** *- To cooperate with International by placing orders for goods in accordance with advance ordering programs announced by International.*

**JMMC** does not have adequate inventory on hand and does not have stock orders in the system to make up the deficiencies.

**New trucks levels are unacceptable and must be improved.**

***Section 16 Subparagraph (c) (1)*** *- To engage, train and maintain sales personnel sufficient to obtain a reasonable share of the sales possibilities in its Trade Area for the goods covered by the Agreement…*

**JMMC's** service department has completed **2** of the **31** or **6%** of the required Technician Training Goals, and **2** of the **27** or **7%** of the Service Managers, Assistant Service Manager, Service Writer and Service Supervisor Training Goals.

**The level of training is incomplete and must be improved.**

***Section 16 Subparagraph (c) (8)*** *– To attend International-conducted or sponsored product, sales and maintenance meetings and use training materials and programs which may be offered by International from time to time.*

Our records indicate that you were not in attendance at our 2002, 2003, 2004, 2005, and 2006 Annual Dealer Meetings.  We view your active participation at our annual meeting as a critical obligation, which you are not fulfilling.

**Your lack of attendance to the Annual Dealer Meetings is not acceptable and must be corrected.**

Ms. Suzanne Thurman
John Meier Motor Co.
October 22, 2007
Page 4

**_Section 25 – Account Records and Financial Reports_** - *The Dealer agrees to maintain accounting records that at all times accurately reflect the financial condition of its business and enable it to prepare monthly operating statements. The Dealer agrees to furnish financial (balance sheet) and operating (profit and loss) statements to International, and any designated affiliate of International, in the format prescribed by International via the DCN, quarterly or otherwise as requested by International. In addition, the Dealer will send their fully detailed and audited annual financial and operating statements to Central Dealer Administration and any designated affiliate of International within sixty (60) days after the close of its fiscal year.*

Dealer Central Administration and Navistar Financial Corporation have not received <u>audited /reliable financial statements</u> from JMMC for fiscal year 2004, 2005, and 2006. In addition, JMMC has not furnished financial statements via the DCN as required by the Agreement.

**Not submitting your financial statement is not acceptable and is in violation of the Agreement.**

International, like its dealers, is constantly investing in the business. We both must constantly invest in our employees, our products and facilities. These are all requirements for success. Clearly, your actions indicate you do not plan to represent International favorably. Unless appropriate corrective action has been taken by **April 21, 2008**, International Truck and Engine Corporation will consider itself entitled to serve notice to terminate pursuant to Section 27 (C) of the J-80 Dealer Sales/Maintenance Agreement.

Sincerely,

*Adriana Fernandez*

Adriana Fernandez
Dealer Development Manager

cc:    Steve Mroczkowski
       Dealer Permanent File

NAVISTAR

Navistar, Inc.    4201 Winfield Road    P : 630 753 5000
Warrenville, IL 60555 USA    W : navistar.com

May 19, 2008                                    **Fed Ex #7920 5842 1119**

Ms. Suzanne Thurman – President
John Meier Motor Co.
213 Truman Blvd.
Crystal City, MO  63019

Suzanne,

   Thanks for meeting with Steve Mroczkowski and I yesterday in St. Louis.  I appreciate you taking time to discuss the issues that are critical to each of us.  The purpose of this letter is to summarize the topics that we discussed and document next steps that were outlined.

   We discussed your letter to Adriana Fernandez that was dated May 8, 2008.  This letter was in response to the breach letter you received from Adriana that was dated October 19, 2007.  In this letter you indicated that you were finalizing plans to enhance the operation of your dealership and to improve sales – truck and parts.  In this letter you also indicate that these plans will be complete within a short time.  We appreciate your responsiveness and look forward to receiving this plan.

   I would like to reiterate several concerns that we discussed yesterday relating to this plan.  First, the magnitude of the investment required to cure the breach items outlined in the October, 2007 letter will be substantial.  Some of the investments called for in the breach letter include facilities improvements, qualified truck sales personnel, inventory (trucks and parts) and properly trained personnel in all business disciplines.  This level of investment is the minimum that we would expect any dealer that is in compliance with the provisions of our Dealer Sales & Maintenance Agreement.  I urge you to be realistic when developing your plan regarding how much money will be required to effectively cure the breaches identified in our letter.  Second, the capital necessary to cure any deficiencies outlined in our letter will have a profound impact on the overall profitability of a dealership in a 100 unit truck market after making these investments.

   As we discussed yesterday – the status quo is not an option.  It is essential that I seek to enforce the provisions of the Dealer Sales & Maintenance Agreement in a consistent fashion for all dealers.  I cannot ignore the issues that have been raised in our October, 2007 breach letter.  If you desire to maintain an independent dealer operating under the terms of our dealer contract, than I am obligated to enforce those terms.   Legal remedies do exist that are outside of the Missouri Administrative hearing process.  While I am optimistic that we can reach a business solution that will meet each of our requirements, I must repeat maintaining the status quo is not an option from my perspective.

We spent a considerable amount of time discussing an alternative that would enable your dealership to continue to operate as a stand alone truck repair and customer parts support business. This business model would allow you to leverage existing relationships with your customers, capitalize on your existing truck repair capabilities and would require substantially less investment than is required of a franchised dealer. This would be accomplished by establishing John Meier Motor Company (JMMC) as an associate dealer of an existing International dealer – Prairie / Archway International. This relationship would result in lower investments in inventory – both truck and parts – for JMMC. It would require less investment in systems and personnel than is required by a franchised dealer. It would also enable you to receive product training and product support training from the primary dealer. Finally, it would provide JMMC with the opportunity to provide captive parts and product warranty support directly to your customers. The associate dealer agreement is a contractual commitment that can be structured to ensure we each achieve our mutual business objectives. I hope that you give this alternative the serious consideration it deserves.

Once again, I appreciate the time that you spent with Steve and me yesterday. I viewed our discussion regarding the breach letter and how we can resolve the issues raised in this letter very positively. Steve will call you later this month to determine if we can facilitate an introduction between Mike Joyce of Prairie / Archway and yourself. Additionally, he will also communicate regarding next steps. Please let me know if you have any questions regarding this communication.

Regards,

John Whitnell
Vice President, Dealer Operations

c:    Steve Mroczkowski – Cantera 3
      Terri Thomas – Cantera 2
      Dealer File